IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

EDWARD E. ZEHR,

        Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

No. C12-2019

RULING ON JUDICIAL REVIEW

## TABLE OF CONTENTS

I.     *INTRODUCTION* ............................................ 2

II.    *PROCEDURAL BACKGROUND* ............................ 2

III.   *PRINCIPLES OF REVIEW* ................................ 3

IV.   *FACTS* ................................................... 5
     A.   *Zehr's Education and Employment Background* ........ 5
     B.   *Administrative Hearing Testimony* .................... 5
          1.   *Zehr's Testimony* ............................. 5
          2.   *Vocational Expert's Testimony* .................. 6
     C.   *Zehr's Medical History* ............................ 7

V.    *CONCLUSIONS OF LAW* ................................ 12
     A.   *ALJ's Disability Determination* ...................... 12
     B.   *Objections Raised by Claimant* ...................... 14
          1.   *Pfab's and McCandless' Objections* ............. 15
          2.   *Vocational Expert's Testimony and the DOT* ......... 17

VI.   *CONCLUSION* ........................................ 20

VII.  *ORDER* ............................................... 21

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff Edward E. Zehr on March 14, 2012, requesting judicial review of the Social Security Commissioner's decision to deny his applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits. Zehr asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide him disability insurance benefits and SSI benefits. In the alternative, Zehr requests the Court to remand this matter for further proceedings.

## II. PROCEDURAL BACKGROUND

On September 18, 2009, Zehr applied for both disability insurance benefits and SSI benefits. In both applications, Zehr alleged an inability to work since December 5, 2007 due to bilateral shoulder problems, pinched nerves, major depression, ringing in his left ear and hearing loss, and chronic pain. Zehr's applications were denied on December 1, 2009. On March 1, 2010, his applications were denied on reconsideration. On April 29, 2010, Zehr requested an administrative hearing before an Administrative Law Judge ("ALJ"). On June 15, 2011, Zehr appeared via video conference with his attorney before ALJ Julie K. Bruntz for an administrative hearing. Zehr and vocational expert Carma A. Mitchell testified at the hearing. In a decision dated August 5, 2011, the ALJ denied Zehr's claims. The ALJ determined that Zehr was not disabled and not entitled to disability insurance benefits or SSI benefits because he was functionally capable of performing work that exists in significant numbers in the national economy. Zehr appealed the ALJ's decision. On January 13, 2012, the Appeals Council denied Zehr's request for review. Consequently, the ALJ's August 5, 2011 decision was adopted as the Commissioner's final decision.

On March 14, 2012, Zehr filed this action for judicial review. The Commissioner filed an Answer on June 22, 2012. On July 25, 2012, Zehr filed a brief arguing that there is not substantial evidence in the record to support the ALJ's finding that he is not disabled

and that he is functionally capable of performing work that exists in significant numbers in the national economy. On September 21, 2012, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On May 17, 2012, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

## III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). Title 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the Commissioner's decision if supported by substantial evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citation omitted). Substantial evidence is defined as "'less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion.'" *Id.* (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Brock v. Astrue*, 674 F.3d 1062, 1063 (8th Cir. 2010) ("Substantial evidence is evidence that a reasonable person might accept as adequate to support a decision but is less than a preponderance.").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that

detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams*, 393 F.3d at 801 (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV. FACTS

### A. Zehr's Education and Employment Background

Zehr was born in 1962. He is a high school graduate. After high school, Zehr also took classes at a community college in automotive technology.

The record contains a detailed earnings report for Zehr. The report covers the time period of 1980 to 2011. From 1980 to 1987, Zehr earned between $1,473.06 (1980) and $11,439.87 (1987). He had no earnings in 1988. From 1989 to 2004, Zehr earned between $2,168.00 (1989) and $29,524.28 (2002). He had no earnings in 2005, and only minimal earnings in 2006 ($81.00). He has no earnings since 2007.

### B. Administrative Hearing Testimony

#### 1. Zehr's Testimony

At the administrative hearing, the Zehr's attorney questioned Zehr about his reasons for not working. Zehr explained that he initially stopped working because his hands bothered him and he "kept dropping wrenches." Zehr further testified that even though he has undergone surgeries, he continues to have numbness in his hands and "constantly" drops things. Zehr also described pain that radiated from his shoulders to his elbows and wrists. He rated the pain at 4 on a scale of 1 to 10, with 10 being the most painful. He stated that prolonged activity makes the pain worse.

Zehr's attorney also asked Zehr to describe his difficulties with mental health. Zehr stated that "I'm not happy any more. . . . I'm, like, subdued. I just, I want to just sit in a corner and be by myself."[1] The ALJ questioned Zehr further:

> Q: Does being around other people cause problems?
> A: Yes. Yes.
> Q: Can you give me some examples? I mean, are you, is it, do you ever go out with your family, or go anywhere?

---

[1] Administrative Record at 38.

A:    No. Not much. But I did go this weekend with my son to a college orientation. And the parents had a meeting and I sat way in the back in the center aisle. . . .

Q:    You just don't like to be around other people?

A:    No, I don't.

Q:    Was that true when you worked?

A:    Somewhat, yes. I wasn't very sociable.

Q:    But it's been, it's more highlighted now?

A:    Yes. . . .

Q:    So has this been something that's come on gradual? So that's [sic] it's happened more and more that you just haven't gone out?

A:    Yes.

Q:    Are you, I mean, are you embarrassed about it, or is that part of it? Or --

A:    I think it's an uneasy feeling with me not working. You know, a feeling of worthlessness.

(Administrative Record at 38-39.) Zehr also testified that he missed wrestling meets and concerts involving his children due to anxiety from being around large crowds of people. When asked what he does in a typical day, Zehr responded that he sits in a chair or sits in the garage. Zehr's attorney inquired further:

Q:    And what? And just, do you lose time then when that's going on? Is it like daydreaming?

A:    Sort of, yes.

(Administrative Record at 44.)

### 2. *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert Carma A. Mitchell with a hypothetical for an individual who:

could occasionally lift and carry 20 pounds, and could frequently lift and carry 10 pounds. He could stand or walk for six hours in an eight-hour work day, and sit for six hours in an eight-hour work day. His ability to push and pull, including the operation of hand and foot controls is unlimited within the weights above. He could occasionally climb ramps and stairs, ladders, ropes and scaffolding. He could occasionally balance, stoop, kneel, crouch and crawl. He

would need to avoid constant overhead reaching bilaterally, and also avoid constant or frequent handling and fingering with the left upper extremity. Further, he would be able to do only simple repetitive tasks on a sustained basis. He could have only short-lived superficial contact with the public, co-workers and supervisors.

(Administrative Record at 49.) The vocational expert testified that under such limitations, Zehr could not perform his past relevant work. The vocational expert further testified that Zehr could perform the following work: (1) shipping weigher (450 positions in Iowa and 29,000 positions in the nation), (2) conveyor-line worker (230 positions in Iowa and 20,000 positions in the nation), and (3) copy messenger (500 positions in Iowa and 86,000 positions in the nation). The ALJ also inquired as to the employability of an individual who "would miss about four days of work per month[.]"[2] The vocational expert testified that under such a limitation, Zehr would be precluded from competitive employment. Similarly, Zehr's attorney asked the vocational expert whether all employment would be eliminated if an individual needed to work at a slow pace for up to one-third of the workday. The vocational expert answered that under such a limitation, Zehr would be precluded from competitive employment.

### C. Zehr's Medical History

In July 2007, Zehr met with Dr. Nelson H. Chesney, M.D., complaining of arm pain and low mood. For example, Zehr reported pain with household chores and flexing his arms. Dr. Chesney noted that Zehr underwent rotator cuff surgery in 2002 and 2004. Upon examination, Dr. Chesney diagnosed Zehr with bilateral shoulder pain and mild depression. Dr. Chesney recommended medication as treatment.

In August 2007, Zehr met with Dr. Jonathan A. Donigan, M.D., for follow-up on his shoulder pain. Dr. Donigan noted that Zehr's pain was "constant" and "worse" with over head and infront activities. Upon examination, Dr. Donigan opined that the "[c]ause

---

[2] Administrative Record at 50.

of [Zehr's] pain [is] unclear, findings on exam [are consistent with] mild impingement, mild biceps tendonitis, and mild CTS [(carpal tunnel syndrome)]."[3]    Dr. Donigan recommended physical therapy as treatment.

In November 2007, Zehr met with Dr. Ryan M. Ilgenfritz, M.D., for follow-up on bilateral should impingement symptoms and bilateral hand numbness. Zehr reported that performing recommended exercises "significantly" decreased his shoulder pain. Dr. Ilgenfritz also noted that an EMG/NCV study showed evidence of left ulnar neuropathy at the elbow, but no evidence of carpal tunnel syndrome bilaterally. Upon examination, Dr. Ilgenfritz diagnosed Zehr with bilateral shoulder pain and bilateral hand numbness. Dr. Ilgenfritz opined that Zehr's hand numbness "does not seem to be completely explained by ulnar neuropathy at the elbow."[4]    Dr. Ilgenfritz further explained that recovery of his hand numbness was "difficult" to predict because he had "no weakness on exam and only minor symptoms with nerve compression at the elbow. Also distribution of numbness is not consistent with this etiology."[5]    Dr. Ilgenfritz recommended continued shoulder exercises as treatment.

In May 2009, Zehr began meeting with Kari Pfab, a nurse practitioner, complaining of low mood and difficulty sleeping. Zehr reported that it generally takes him 2-3 hours to fall asleep, and he usually only sleeps about 4 hours per night. Zehr also stated that he has "difficulty in finding enjoyment in things[, and] . . . [a]dmits occ[asionally] feeling hopeless, stating that he has difficulty in seeing how things can get any better."[6]    Zehr described his energy as "fair," but his motivation as "poor." Pfab diagnosed Zehr with major depressive disorder, moderate. Pfab suggested medication as treatment.

---

[3] Administrative Record at 335.

[4] *Id.* at 326.

[5] Administrative Record at 326.

[6] *Id.* at 313-14.

On November 30, 2009, Dr. Rene Staudacher, D.O., reviewed Zehr's medical records and provided Disability Determination Services ("DDS") with a physical residual functional capacity ("RFC") assessment for Zehr. Dr. Staudacher determined that Zehr could: (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Staudacher also determined that Zehr could occasionally climb, balance, stoop, kneel, crouch, and crawl. Dr. Staudacher found that Zehr was limited in his ability to reach in all directions, handle objects, and use his fingers for fine manipulation. Dr. Staudacher found no visual, communicative, or environmental limitations. Dr. Staudacher opined that "[t]here is some inconsistency in that [Zehr] has not sought recent [treatment] for his physical allegations despite seeking [treatment] for mental ones."[7]

On March 10, 2010, Dr. Scott Shafer, Ph.D., reviewed Zehr's medical records and provided DDS with a Psychiatric Review Technique and mental RFC assessment for Zehr. On the Psychiatric Review Technique assessment, Dr. Shafer diagnosed Zehr with major depressive disorder and alcohol use. Dr. Shafer determined that Zehr had the following limitations: no restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Shafer determined that Zehr was moderately limited in his ability to: understand and remember detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the

---

[7] Administrative Record at 357.

general public, and accept instructions and respond appropriately to criticism from supervisors. Dr. Shafer concluded that:

> Overall, [Zehr] does have difficulties with concentration and focus. His symptoms are managed satisfactory with medications. Drinking cession [sic] would most likely continue to improve his symptoms. [Zehr's] current level of functioning although severe does not meet/equal listing level severity. He retains the ability to do simple repetitive tasks on a sustained basis.

(Administrative Record at 374.)

In July 2010, Zehr began meeting with Erin McCandless, a clinical social worker at the Iowa City Veterans Affairs Medical Center, regarding his depression. Zehr reported feeling worthless, hopeless at times, and low moods on a daily basis. Upon examination, McCandless diagnosed Zehr with depression. McCandless recommended therapy as treatment.

On March 11, 2011, at the request of Zehr's attorney, McCandless filled out a "Mental Impairment Questionnaire." In the questionnaire, McCandless diagnosed Zehr with major depressive disorder, moderate, and OCD traits. McCandless noted that Zehr had been undertaking cognitive behavioral therapy with mild to moderate response. McCandless indicated that Zehr would continue treatment, "as symptoms have not been alleviated."[8] McCandless identified the following signs and symptoms for Zehr: pervasive loss of interest in almost all activities, decreased energy, feelings of guilt and worthlessness, generalized persistent anxiety, mood disturbance, difficulty thinking and concentrating, emotional withdrawal and isolation, easy distractibility, memory impairments, and sleep disturbance. McCandless opined that Zehr was seriously limited, but not precluded in the ability to: carry out short and simple instructions, complete a normal workday and workweek without interruptions from psychologically based symptoms, deal with normal work stress, understand and remember detailed instructions,

---

[8] Administrative Record at 462.

and carry out detailed instructions. McCandless also opined that Zehr was unable to meet competitive standards in the ability to: perform at a consistent pace without an unreasonable number and length of rest periods and deal with stress of semi-skilled and skilled work. McCandless determined that Zehr had the following limitations: marked restriction of activities of daily living, marked difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence, or pace. McCandless anticipated that Zehr would miss about four days of work per month due to his impairments and/or treatment of his impairments. McCandless concluded that "both mental [and] physical impairments combined are having [a] negative impact on [Zehr's] ability to work."[9]

On March 30, 2011, at the request of Zehr's attorney, Pfab filled out a "Mental Impairment Questionnaire." In the questionnaire, Pfab diagnosed Zehr with major depressive disorder, insomnia, and OCD traits. Pfab described Zehr has having a sad affect, anxiety, poor/low self esteem, and irritability. Pfab identified the following signs and symptoms for Zehr: decreased energy, thoughts of suicide, feelings of guilt and worthlessness, generalized persistent anxiety, mood disturbance, difficulty thinking and concentrating, recurrent obsessions or compulsions which are a source of marked distress, emotional withdrawal and isolation, and sleep disturbance. Pfab opined that Zehr was seriously limited, but not precluded in the ability to: maintain regular attendance and be punctual within customary, usually strict tolerances, sustain an ordinary routine without special supervision, make simple work-related decisions, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, respond appropriately to changes in a routine work setting, deal with normal work stress, deal with stress of semi-skilled and skilled work, and interact appropriately with the general public. Pfab also opined that Zehr was unable to meet competitive standards in the ability to: work in

_____

[9] Administrative Record at 467.

coordination with or proximity to others without being unduly distracted, complete a normal workday or workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. Pfab determined that Zehr had the following limitations: marked restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Lastly, Pfab anticipated that Zehr would miss about four days of work per month due to his impairments and/or treatment of his impairments.

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Zehr is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *Perks*, 687 F.3d at 1091-92 (discussing the five-step sequential evaluation process); *Medhaug v. Astrue*, 578 F.3d 805, 813-14 (8th Cir. 2009) (same); *see also* 20 C.F.R. § 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the fourth step asks whether the claimant has the residual functional capacity to do past relevant work. If so, the claimant is not disabled. Fifth, the ALJ determines whether the claimant can perform other jobs in the economy. If so, the claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "bears the burden of demonstrating an inability to return to [his] or her past relevant work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*, 524 F.3d 872, 875 n.3 (8th Cir. 2008)). If the claimant meets this burden, the burden shifts to the Commissioner at step five to demonstrate that "given [the claimant's] RFC [(residual functional capacity)], age, education, and work experience, there [are] a significant number of other jobs in the national economy that [the claimant] could perform." *Brock*, 674 F.3d at 1064 (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir. 2005)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 416.945. The ALJ bears the responsibility for determining "'a claimant's RFC based on all the relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Boettcher v. Astrue*, 652 F.3d 860, 867 (8th Cir. 2011) (quoting *Moore*, 572 F.3d at 523); 20 C.F.R. § 416.945.

The ALJ applied the first step of the analysis and determined that Zehr had not engaged in substantial gainful activity since December 5, 2007. At the second step, the ALJ concluded from the medical evidence that Zehr had the following severe impairments:

13

history of bilateral rotator cuff repair, obesity, depression, and ongoing alcohol use. At the third step, the ALJ found that Zehr did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Zehr's RFC as follows:

> [Zehr] has the residual functional capacity to perform less than light work . . . and involving lifting up to 20 pounds occasionally and 10 pounds frequently; sitting up to 6 hours in an 8 hour day; standing or walking up to 6 hours in an 8 hour day. The ability to push and pull, including the operation of hand and foot controls, is limited within the above weights. The individual can only occasionally climb ramps, stairs, ladders, ropes, and scaffolds. He can occasionally balance, stoop, knee [sic], crouch, and crawl. He would need to avoid constant overhead reaching bilaterally. He should avoid constant or frequent handling and fingering with the left upper extremity. [Zehr] can perform only simple, repetitive tasks on a sustained basis and should have only short-lived, superficial contact with co-workers, supervisors, and the public.

(Administrative Record at 16.) Also at the fourth step, the ALJ determined that Zehr was unable to perform any of his past relevant work. At the fifth step, the ALJ determined that based on his age, education, previous work experience, and RFC, Zehr could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that Zehr was not disabled.

### B. Objections Raised by Claimant

Zehr argues that the ALJ erred in two respects. First, Zehr argues that the ALJ failed to properly evaluate the opinions of Pfab and McCandless, two treating sources for Zehr. Second, Zehr argues that the ALJ failed to properly evaluate the vocational expert's testimony because the ALJ did not ascertain whether there were any inconsistencies between the vocational expert's testimony and the Dictionary of Occupational Titles ("DOT").

## 1. Pfab's and McCandless' Objections

Kari Pfab, a nurse practitioner, and Erin McCandless, a licensed social worker, are not classified as "acceptable medical sources" under the Social Security Regulations. Even though Pfab and McCandless are not "acceptable medical sources," the Social Security Administration ("SSA") requires an ALJ to consider such opinions in making a final disability determination. On August 9, 2006, the SSA issued Social Security Ruling 06-03p. The purpose of Ruling 06-03p was to clarify how the SSA considers opinions from sources not classified as "acceptable medical sources." *See Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007) (discussing SSR 06-03p). Ruling 06-03p provides that when considering the opinion of a source that is classified as a "not acceptable medical source," such as a nurse practitioner or licensed social worker, "it would be appropriate to consider such factors as the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion." SSR 06-03p. Furthermore, in discussing SSR 06-03p, the Eighth Circuit Court of Appeals, in *Sloan*, pointed out:

> Information from these 'other sources' cannot establish the existence of a medically determinable impairment, according to SSR 06-3p. Instead, there must be evidence from an 'acceptable medical source' for this purpose. However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.

*Sloan*, 499 F.3d at 888 (quoting SSR 06-03p). In determining the weight afforded to "other medical evidence," an "ALJ has more discretion and is permitted to consider any inconsistencies found within the record." *Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005) (citation omitted).

15

In her decision, the ALJ thoroughly reviewed both Pfab's and McCandless' long record of treating Zehr, and described in detail both Pfab's and McCandless' opinions and treatment strategies.[10]    In weighing both Pfab's and McCandless' opinions, the ALJ accorded:

> little weight to the opinions of the social worker and nurse practitioner, who are not considered acceptable medical sources, as the opinions were inconsistent with objective evidence and [Zehr's] level of activities of daily living. For instance, mental status examinations often revealed adequate grooming, good eye contact, somewhat depressed mood, good insight, and no suicidal ideation not consistent with marked degree of functional limitations as noted by the social worker and nurse practitioner. Furthermore, symptoms appeared to be managed satisfactorily with medication.

(Administrative Record at 21.)   The ALJ further explained that:

> In sum, no one doubts [Zehr] experiences some limitations. Overall, [Zehr] experiences difficulty with concentration and focus; however, his symptoms are managed satisfactorily with medication. Alcohol cessation would most likely continue to improve his symptoms and has been repeatedly recommended by his doctors. [Zehr's] failure to follow medical advice does not reflect favorably upon him in determining credibility. The above residual functional capacity assessment is supported by the objective medical evidence, the medical opinions when afforded appropriate weight, and [Zehr's] subjective complaints during the relevant period when taken in context. In view of all of the factors discussed above, the limitations on [Zehr's] capacities which were described earlier in this decision are considered warranted, but no greater or additional limitations are justified.

(Administrative Record at 21.)

Having reviewed the entire record, the Court finds that the ALJ properly considered both Pfab's and McCandless' opinions in accordance with SSR 06-03p. Furthermore, the

---

[10] *See* Administrative Record at 18-20.

ALJ properly articulated her reasons for granting "little weight" to both Pfab's and McCandless' opinions, and for finding their opinions to be inconsistent with the record as a whole. *See Raney*, 396 F.3d at 1010; *see also Kirby*, 500 F.3d at 709 (providing that an ALJ is entitled to give less weight to a medical source opinion where the opinion is based on a claimant's subjective complaints rather than on objective medical evidence); *Sloan*, 499 F.3d at 889 (providing that a factor to consider in weighing evidence from a medical source that is not an "acceptable medical source" is the expertise of the source as it relates to the claimant's impairment). Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 2. *Vocational Expert's Testimony and the DOT*

Zehr argues that the ALJ's ultimate disability determination is flawed because the ALJ improperly relied on vocational expert testimony that was inconsistent with the DOT. At the administrative hearing, the ALJ provided the vocational expert with a hypothetical question which set forth the following limitations:

> [The individual] could occasionally lift and carry 20 pounds, and could frequently lift and carry 10 pounds. He could stand or walk for six hours in an eight-hour work day, and sit for six hours in an eight-hour work day. His ability to push and pull, including the operation of hand and foot controls is unlimited within the weights above. He could occasionally climb ramps and stairs, ladders, ropes and scaffolding. He could occasionally balance, stoop, kneel, crouch and crawl. He would need to avoid constant overhead reaching bilaterally, and also *avoid constant or frequent handling and fingering with the left upper extremity*. Further, he would be able to do only simple repetitive tasks on a sustained basis. He could have only short-lived superficial contact with the public, co-workers and supervisors.

(Administrative Record at 49.) (Emphasis added.) Based on this hypothetical, the vocational expert testified that Zehr could perform the following jobs: (1) shipping weigher, (2) conveyor-line worker, and (3) copy messenger.

Zehr argues that the vocational expert's testimony is flawed because Zehr's RFC, which was provided by the ALJ in his hypothetical to the vocational expert, is inconsistent with the DOT's job descriptions for shipping weigher and copy messanger. In other words, Zehr asserts that the ALJ's RFC places restrictions on him which are inconsistent with the DOT job descriptions, and preclude him from being able to perform the jobs of shipping weigher and copy messenger. Specifically, Zehr points out that each of these jobs requires the worker to have the ability to handle "frequently." Zehr maintains that the requirement to handle "frequently" is inconsistent with the ALJ's hypothetical question to the vocational expert.

Social Security Regulation ("SSR") 00-4p explains that in making disability determinations, the Social Security Administration relies "primarily on the DOT for information about the requirements of work in the national economy." SSR 00-4p, 2000 WL 1898704 at *2. SSR 00-4p further provides that:

> Occupational evidence provided by a VE [(vocational expert)] . . . generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between the VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

> Neither the DOT nor the VE . . . evidence automatically 'trumps' when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE . . . is reasonable and provides a basis for relying on the VE . . . testimony rather than on the DOT information.

*Id.*; *see also Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007) (An ALJ is "required not only to ask the expert whether there is a conflict, but also to obtain an explanation for any such conflict."); *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir. 1997) ("When expert testimony conflicts with the DOT, and the DOT classifications are not rebutted, the DOT controls."). While SSR 00-4p clearly provides that occupation evidence provided by a vocational expert should be consistent with occupational information contained in the DOT, the Court is cautioned not to read too much into this Social Security regulation. In *Wheeler v. Apfel*, 224 F.3d 891 (8th Cir. 2000), the Eighth Circuit explained that:

> 'reliance on the DOT as a definitive authority on job requirements is misplaced, however, for DOT definitions are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range.' The DOT itself cautions that its descriptions may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities. In other words, not all of the jobs in every category have requirements identical to or as rigorous as those listed in the DOT.

*Id.* at 897 (quoting *Hall v. Chater*, 109 F.3d 1255, 1259 (8th Cir. 1997)).

Here, the ALJ sought testimony from a vocational expert at the administrative hearing. The vocational expert's opinion that Zehr could perform the jobs of shipping weigher, conveyor-line worker, and copy messenger was based on the ALJ's hypothetical question which incorporated the ALJ's RFC assessment for Zehr, including the ALJ's restrictions on handling. Because the ALJ provided the vocational expert with a proper hypothetical question, and the ALJ's RFC assessment for Zehr is consistent with the DOT in all respects, except for the handling requirements of the shipping weigher and copy messenger jobs, the Court finds that the ALJ did not err in relying on the vocational expert's testimony. *See Gragg v. Astrue*, 615 F.3d 932. 941 (8th Cir. 2010) ("Because the hypothetical was adequate, the vocational expert's testimony was reliable to establish that there are jobs that Gragg can perform that exist in significant numbers within the regional and national economies."); *see also Wagner v. Astrue*, 499 F.3d 842, 854 (8th

Cir. 2007) (recognizing that an ALJ may rely on the testimony of a vocational expert when making his or her findings at step four and five of the five-step sequential evaluation).

Moreover, even if the ALJ erred in relying on the vocational expert's testimony with regard to the shipping weigher and copy messenger jobs, the ALJ did not err in relying on the vocational expert's testimony regarding the conveyor-line worker job. In that job, the handling requirements are only occasional. The Social Security Regulations provide that "[w]ork exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which [a claimant is] able to meet[.]" 20 C.F.R. § 404.1566(b); *see also* 20 C.F.R. § 416.966(b) (same); *Weiler v. Apfel*, 179 F.3d 1107, 1110 (8th Cir. 1999) (providing that on review a court is not required to compare the claimant's RFC to every job recommended by the vocational expert). While the vocational expert testified that there are only 230 conveyor-line worker positions in Iowa, the Eighth Circuit has found that an occupation with 200 positions is adequate for meeting the requirement at step five of the disability determination, that there are a "significant number" of jobs in the national economy which a claimant can perform. *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997). Therefore, the Court determines that the ALJ's disability determination is not flawed, and the ALJ properly relied on the vocational expert testimony in this matter, in particular with the testimony associated with the occupation of conveyor-line worker. *See Wagner*, 499 F.3d at 854. Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

## VI. CONCLUSION

The Court finds that the ALJ properly weighed the opinions of both Pfab and McCandless. The Court also finds that the ALJ did not err in relying on the testimony of the vocational expert to find that there are a significant number of jobs in the national

economy that Zehr can perform. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## *VII. ORDER*

For the foregoing reasons, it is hereby **ORDERED**:

1.      The final decision of the Commissioner of Social Security is **AFFIRMED**;

2.      Plaintiff's Complaint (docket number 3) is **DISMISSED** with prejudice; and

3.      The Clerk of Court is directed to enter judgment accordingly.

DATED this 24th day of January, 2013.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA